Good morning, your honors. Jonathan Milbert for Petitioner Alexander Gabay. The issue that I would like to discuss this morning is whether, as we believe, the failure of Mr. Gabay's trial attorney, Ronald Heading, to investigate his defense that it was his girlfriend, Oksana Meshkova, who was responsible for the murder of the victim, whereas he was an accessory after the fact. Counsel, how long before trial was that other lawyer substituted? It was quite a ways before trial, a number of months. I can tell you precisely if you give me a moment. So the substitution of counsel was months before the trial? Yes, it was a long time before. What had occurred is that shortly after the preliminary hearing, Mr. Van Coven, who had previously represented Mr. Gabay, was arrested for witness tampering and various other criminal activities. I had trouble with your multiple representation argument because, as I understand it, Kyler was just for multiple representation, not for a lawyer who might have had personal motives that were contrary to his client's interests. All right. I'll state my position briefly on that. Kyler did not distinguish between the various types of conflicts of interest. What occurred is, after Kyler, the Ninth Circuit said in Manholt that the same presumed prejudice rule applied to other kinds of conflicts. So then we have the Mickens case. Mickens was actually a case involving multiple representation. But in Dicta, I believe it was Justice Scalia who said, Well, we haven't yet had a case where we've held that the presumed prejudice rule applies to other kinds of conflicts of interest. Then we had this court in Ehrt v. Ornosky. That was the case where the female lawyer's passion overruled her judgment, and she got involved with her client on death row. So the issue came up, well, is this a conflict of interest, and what standard are we going to use? Well, as the dissenting opinion, I believe it was dissenting, it may have been a concurring opinion, pointed out, being in love is not a conflict of interest. In fact, if anything, it would seem that it would make this lawyer more likely to zealously represent this gentleman on death row, who was her husband at that time. I thought that the point was a little different, that Kyler says multiple representation. We had gone beyond that and said some interest or desire that may be different, and the Supreme Court said no, multiple representation. And we said the Supreme Court meant multiple representation. It dealt with the problem of one lawyer representing two defendants, where each has an interest in getting a deal by snitching the other one out. You know, I've read Kyler several times, and my interpretation is that the presumed prejudice rule is not limited to a multiple representation. We can't go beyond what the Supreme Court said under 2254. I understand, but our position is that Kyler is still the law. Let's say it is. Why is having had sex with the dead woman, the murdered woman, and a multiple representation or other sort of conflict of interest that would cause Gabbay's first lawyer to set him up instead of Gabbay's girlfriend up for the murder? Well, first of all, if you're intimately involved with the victim, you have no business defending a gentleman accused of murdering her. I didn't ask you about the ethics of it. I asked you a more limited question. Sure. The primary conflict was that the same witnesses who could exonerate Mr. Gabbay were also witnesses who could implicate the first lawyer, Van Coven, in his activities running the prostitution ring, the witness tampering, and what appeared to be initiating deportations of material witnesses, etc. This information was all provided by Gabbay's mother to the second lawyer, was it not? We're talking about the… Well, first of all, shortly after Mr. Gabbay's arrest, Mr. Mezariski… It might help me if you just tell me yes or no and then explain so that I know where you're going here. Sure. She did provide the information, did she not? Yes. All right. So go ahead with your explanation. I didn't mean to cut you off. Okay. Well, now we're getting into the issue of Mr. Heading's deficient representation rather than the issue of Van Coven's conflicts of interest, although there's an overlap. Well, it goes to the issue of prejudice in either event, doesn't it? Yes. Actual prejudice. Yes, that is true. That's my issue. I mean, it's certainly a strange situation, but I had some difficulty determining where the prejudice lay, even with respect to the failure to interview the person whose name starts with K that I can't pronounce. I apologize. Shrivel up, Chuck. Thank you. And I would appreciate your talking directly about where the prejudice lies that is sufficient to require us to overturn the decision of the state court here. Certainly. There's no question in this case that both Mr. Gabay and his girlfriend, Oksana Mishkova, were there in the victim's apartment at the time she was murdered. Mr. Gabay's position, and it's still his position, is that Oksana committed the murder, whereas he was an accessory after the fact, and that the state prosecutor basically gave immunity to the wrong person. And Miss Mishkova was allowed to walk out of the courtroom scot-free, and Mr. Gabay ends up doing God knows how many years in prison. Now, what is the evidence in the prosecution's case? The main evidence is the testimony of two immunized witnesses, the girlfriend, Oksana Mishkova, and Marvin Graham, both of whom were told that unless they cooperated, they would be liable as accomplices in the murder, and who would say virtually anything to save their own skins. That's the great bulk of the prosecution's evidence. The other evidence we have, such as the fact that Petitioner, or Mr. Gabay, who never denied being in the victim's apartment, had blood on his shoes, of course, I mean there was blood all over the bedroom where the victim was murdered, that there's a video showing him and the girlfriend entering the victim's apartment, all of that is entirely consistent with his accessory after the fact defense. Blood on our shoes is a little better than that. If somebody's girlfriend was stabbing somebody else, you'd expect them to either go over there and stop them, and pull them apart, and there's no indication he did that, or else to back off and say, whoa, this is getting to be a little out of my league. And if he backed off, he wouldn't have blood all over his shoes. Well, he heard the sounds of the scuffle. He rushed into the bedroom. It's certainly not unreasonable to believe that there was blood, which he stepped in at the time. But I think the point is that the witnesses that we're talking about, who were never even interviewed by either Mr. Van Koving or Mr. Heading, were prepared to testify that it was the girlfriend, Oksana, who made numerous statements in advance about how she intended to kill the victim, and then bragged about it afterwards. And there are numerous cases from the Ninth Circuit, which hold that a failure of an attorney to even interview witnesses who might exculpate his client is prejudicial in effective assistance of counsel. For example, in Sanders v. Rotell, which we cited in the brief, we had a situation similar to this in many ways, in which someone else confessed to the murder, the attorney knew about it, failed to interview the witness, held prejudicial in effective assistance of counsel, reversed. Counsel, you have exceeded your time, but we will hear from the State now, and then we will give you some rebuttal time since we took some of it with questions. And I hadn't even completed my answer to Your Honor's question. I think we have a pretty good handle on your argument. Very well, Your Honor, thank you. Thank you. Good morning. Deputy Attorney General J. Michael Lehman on behalf of Respondent Jeanne Woodford. Counsel, maybe you can start where opposing counsel left off, and that is my concern, and my colleagues may have different concerns, but mine rests with the failure to interview the witnesses. There's no indication that the trial counsel, the second lawyer involved, he didn't interview a couple of potentially useful witnesses on behalf of the defense. Why isn't that prejudicial? Well, let me go ahead then and go to the prejudice, the global prejudice question, which I think you're getting to. Now, in addition to the girlfriend's testimony, Meshkova's testimony, which was corroborated by other evidence, the prosecution presented the following evidence. First, it's undisputed that Petitioner confessed to the murder, specifically saying, I shot Luda minutes after committing it. This is to Graham? This is to Graham. Petitioner doesn't deny that. He testified that's a fact. He said he was simply trying to protect his girlfriend, but he doesn't deny that he confessed to shooting the victim. Now, and we know that that is, in fact, how the victim died. Graham further specifically stated that Petitioner confessed, I shot Luda in the chest. Now, we know for a fact that that is what happened, or we know that Luda, the victim, was shot in the chest. We know that Mr. Graham spoke only English. Ms. Meshkova spoke only Russian. The only way Mr. Graham could have known that the victim was shot in the chest was through Petitioner. Second, there was a discussion about the victim's blood being found on Petitioner's shoe. We need to remember that Petitioner is a former competitive kickboxer who still kept a heavy bag in his apartment and still used it. Now, my brother counsel states that there was blood all over the place, and, of course, he had blood on his shoes. However, the only evidence at trial regarding the only blood evidence regarding either Meshkova or Petitioner indicated that Petitioner had the victim's blood on his shoe. I'm getting a little lost. The question that Judge Graber asked is one that is the focus of my attention, too. What about the failure to interview the two witnesses? And what would make it easier for me to understand your answer is if you named the two witnesses, said whether he interviewed them, said why he didn't, and say whether it would have mattered. Okay. I'm sorry. I was focused on the prejudice part of this. You were talking about what you came to the podium to talk about. I was listening for the answer to Judge Graber's question. No, no, I understand. That was going to the prejudice. In other words, Mr. Mezaritsky, who he is. Oh, so you're admitting he failed to interview two witnesses and he should have interviewed them, but it doesn't matter. No. That's your argument. No, no, no, no. I understood Judge Graber's question to be about the prejudice part, but we'll go ahead to the interviewing portion of it. The two witnesses are Mezaritsky and… The one that starts with K. Let's just go with the K witness. Okay. To the first part of that, did Mr. Heading interview Mr. Mezaritsky? The answer is yes or no. We don't know because Mr. Mezaritsky doesn't say one way or the other in his declaration. Mr. Heading's declaration isn't included. Mr. Mezaritsky, in his declaration, executed in 2004. Petitioner was tried in January 2002. But Mr. Mezaritsky, in his 2004 declaration, says the following. I would have testified. I told Mr. Van Coven this. Now, keep in mind, Mr. Mezaritsky, Mr. Van Coven, and Petitioner are all friends. They're all old friends. So I don't know if Mr. Van Coven, quote-unquote, formally interviewed Mr. Mezaritsky, but we do know that Mr. Mezaritsky, in his declaration, says, I told Mr. Van Coven I would have testified. I was happy to testify. Testify to what? This is what he says. This is what Mr. Mezaritsky says in his declaration. He doesn't say specifically that Mishkova confessed to the crime. Was this something about the tongue? This is about, yes. Yes, is the short answer. He states that after the murder, Mishkova was saying it's funny how, when one is choked, the tongue comes out. And then Ms. Well, the victim was strangled as well as shot. As well as shot. And there was medical evidence that she would have died from the strangulation had she not been shot. That's true. I hasten to add the medical examiner also testified that she suffered blows unlikely to have been inflicted by a woman. The medical examiner also testified that the victim, yes, the victim lacked any defensive limbs, which, of course, is inconsistent with Petitioner's story, that there was a physical altercation that eventually Mishkova got the better of. But returning to the issue of Mezaritsky, what he actually says he would have told us. Really help us. You know, I realize you come with things you want to say. No, no, I understand. But we already read the briefs and the excerpts, and we want to hear the answer to the question. I understand. I think we were at the point of, did he speak to him? And the answer is, we don't know. Now, we know he spoke to Van Coven. That's the first trial counsel. Now, the second counsel is Mr. Heving. Here's what we know about what Mr. Mezaritsky may or may not have said to the second trial counsel. And, Judge Lucero, you had a question to opposing counsel, which I think was getting at this. We have a declaration of Petitioner's mother. Petitioner's mother states she told the second attorney, Mr. Heving, about the existence of Mr. Mezaritsky, and that Mr. Mezaritsky would be happy to testify. And the other witness as well. Yes, and the other witness. According to Petitioner's mother, Mr. Heving stated, I would have to talk to Mr. Mezaritsky's counsel. I doubt he'll let him testify. That's what Petitioner's mother states in her declaration. And the reason why that is, is as follows. And it gets to the broader point in that both of these witnesses, Mezaritsky and Krivolopichek, simply weren't available at the time because they were both facing federal charges. The chronology is this. Well, are we sure about that with respect to Krivolopichek? Because her testimony seems more exculpatory and less difficult for Mr. Gebay because she would have said that the girlfriend or the other person said that she was the one, Meshkova, said that she was the one who had killed the victim. She's the only one of the two that actually says that Meshkova admitted to killing him. Right, so that would have been exculpatory evidence very helpful to the defense. Well, I don't know that it would have been very helpful because all she states is... All they have to do is create a reasonable doubt in the mind of one juror. Certainly, certainly. Okay, and having someone else confess to the murder when both of them were in the room would be very helpful ordinarily. It would be helpful. It would be better than not having it. However, it needs to be remembered that Krivolopichek's version of Meshkova's supposed confession doesn't include much specifics about what actually happened. So what?  I mean, neither did the confession to Graham, you know. Well, if I may, he did say, I shot her. Well, how could he have two confessions? Why just assume that and go on? Right, right. Okay, well, but again, it needs to be remembered this is not simply a he said, she said case. There is other evidence. Specifically, there's third-party evidence or a third-party witness, which is Marvin Graham. And again, Petitioner acknowledges that Marvin Graham had nothing to do with the crime. He also acknowledges that he confessed to Mr. Graham. But if his defense is, I was covering for my girlfriend, and he has a witness who said the girlfriend confessed, I don't know why that doesn't, you know, solidify his defense rather than be, it just seems very important to me. I just don't understand why that wouldn't be prejudicial. Well, again, it certainly would have been helpful had Prowolczyk been available. As we say, she was at that time facing federal charges. It's not clear she was. For what? She was part of the alien smuggling ring. I don't know the specifics. But she was not implicated in the murder. No, no, no, no. So why would she be unavailable with respect to this issue? Well, the question would be whether her counsel would have allowed her to testify. Well, we don't. Do we know? We don't know that. We don't know one way or the other. She doesn't state. Well, that's the point. Is it not? I mean, we don't know if she would have or not. If she would have testified? Yes. Right. But did counsel ask? Did Heading ask about that? That one is less clear. I could find nothing in the record on that point. I can't either. What we do have is something on the record, a point where Heading obtains a continuance to speak to witnesses involved in the federal sting, ongoing federal investigation, one of which he specifically states is Nazarensky. Prowolczyk, we don't know. He doesn't specifically state her. But she seems to me, at least just speaking for myself, to be really key to all of this because she, according to her statement, Mishkova specifically said it had been she who killed the victim. Right. But my only point on that was it lacks some of the specifics that, for example, Mishkova's version of that and Marvin Graham's version of that had, including the use of a firearm, the use of a gun. Well, she, well, okay. Okay. And just one last point, if I could. We cited, we submitted a supplemental authority regarding Harrison v. Richter. We have that. Yeah. Our point is that this being a 2254 case, Richter's dispositive in this particular one. Well, is the issue before us a did he or didn't she question or is it whether the California Supreme Court erred under Harrington in making its judgment? Is the review under a deferential standard? Do we not? Certainly. Certainly. And, again, we cite Richter simply to highlight the double deference required under Yarbrough and now, again, it seems to me that the points Judge Graber makes or both of my colleagues make are valid points. If, in fact, they're supported by the record, that's where I'm at a standstill. I don't know whether the record, in fact, supports that. Well, again, as you said, it's not clear. We don't have Harrington's declaration. We have Przewolczyk's declaration, which is generally she states that Meshkova says she did it and I would have testified. And beyond that, it doesn't really go much farther. And that's the extent of that evidence. Are there any particular words or lines or paragraphs of the excerpts that you would like to point us to to show the absence of prejudice? I was just wondering if you had a big yellow sticky with a star on it. Yeah. I don't want to miss the page. Yeah. I don't have specific evidentiary sites to the five points I was getting to before. I'm sorry. They're mostly in. I sometimes have something circled in the star. I do that. Two exclamation points. Yes. Oftentimes when there is a key smoking gun, as it were, this was more of a building up, building up, building up. Okay. Thank you, counsel. Thank you. You may have two minutes for rebuttal. I'll have to speak quickly. First of all, regarding the standard, Harrington simply says that you have to give deference to a silent decision such as a postcard denial by the California Supreme Court. But this court still has to independently review the record to determine if the state court's decision. So why don't you get right to that point that my colleagues asked about? Yes. Where's the exclamation point in the stars to look at? Sure. In the record. Okay. Let me just have a minute so I can tell you exactly where it fits in. Okay. When you review the record independently, you have to determine whether or not the California Supreme Court's decision was contrary to or an unreasonable application of the relevant Supreme Court precedent, which is the Strickland case. And Strickland and every single case from the Ninth Circuit interpreting it all say failure to even interview an exculpatory witness is ineffective assistance of counsel. Exactly. There are innumerable cases that say, well, it wouldn't have mattered because the witness wouldn't have talked, or what the witness had to say would not have changed the outcome of the trial. Well, now we're getting to the prejudice issue, I think. That's right. All right. I'm going to address that in a minute. But first of all, to clarify, and I do have a yellow sticky in my excerpt of record, and it's right on top of the declaration of Mr. What page? Page 18 and 19. And it's right on top of the declaration of Mr. Heading's investigator, Ashley Faria. And I would urge the court to pay particular attention to that. Mr. Faria says that he was told just to interview one witness, Mr. Graham. He spent a total of seven hours on the case. He assumed that Mr. Heading had been relieved because he wasn't even provided with the murder book. He wasn't told to interview any of the relevant witnesses. Here we have an attorney who just wasn't interested in doing any serious investigation at all. And based on Mr. Faria's declaration, and since there is no indication that any other investigator was hired, it's pretty clear that Mr. Heading made no attempt whatsoever to interview either Mezaritsky. All I know from this is that he hired a private investigator, which means he was investigating, and that he didn't specifically ask the investigator to interview any other witnesses. Now, what is the part showing, if only you'd interviewed me, I would have said this, and it would have turned the whole trial upside down. Well, we have the declarations of Krivolafchuk and Mezaritsky. And as Judge Graber has said, when you have a confession by someone other than the defendant that they committed the murder, it is at least reasonably probable that that could have made a difference to the jury. Was it exactly a confession? And where is that in the record? Pardon me? To make it easy on ourselves, what pages in the record is that? You're talking about the... The confession, this alleged confession. Yes, hold on. I thought the words were more ambiguous. That's what I want to see. Yeah. One moment, Your Honor. Okay, the declaration of Olena Krivolafchuk starts at page one of the petitioner's excerpt of record. And according to Krivolafchuk, Oksana, the girlfriend, says to her friends before the murder is committed... Yes. That's, I mean, by anyone's definition, a flat-out confession to the murder. It said it had been her... Give us the context of that statement. Is that before the murder? Well, she may... According to Krivolafchuk, Oksana before the murder made statements about how much she hated the victim and basically how she was going to kill her or knock her off. And then afterwards... And that's the page? And that's at page one, that it's afterwards she said this? You've got a problem right there. In that paragraph, the girls are all nervous because they're afraid it's a serial killer who's killing prostitutes so that they might be in danger. So they had talked to this woman and she says, It had been her that killed Lyudmila, that's the good part for you, not pimps or sex maniacs. The details she poured on us further were even more shocking. Do you know how the tongue falls out when you choke a person? Only thing is, she wasn't killed by being choked to death, she was killed by being shot to death. Well, we don't know that because the medical examiner, I'm pretty sure, testified that even if she hadn't been shot, she would have died from the strangulation alone. She was strangled, whether he killed her or not, she was clearly strangled. In other words, Your Honor, she died from the gunshot wound, according to the medical examiner. But the medical examiner also testified that even if she had not been shot, she would have died from the strangulation. Which clearly occurred. Pardon me? Which clearly occurred. Yes. Counsel, you have exceeded your time also. Oh, no. Time passes so quickly when you're having fun. It does. It does. This is a very interesting case. We appreciate the arguments of both counsel and the case will stand submitted. Thank you, Your Honors. Thank you. I neglected to mention that we do have three cases that have been submitted on the briefs. United States v. Hack, Maloney v. Verizon, and Santa Paula Elementary School v. Ventura County. And that brings us to our next argued case, Studio Transportation Drivers v. Entertainment Media Specialists.
judges: Kleinfeld, Lucero, Graber